IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-CV-1759-REB-KLM

LEVI FRASIER,

        Plaintiff,

        v.

Denver Police Officers CHRISTOPHER L. EVANS, # 05151,
CHARLES C. JONES, # 04120, JOHN H. BAUER, # 970321,
RUSSELL BOTHWELL, # 94015, JOHN ROBLEDO, and CITY AND COUNTY OF
DENVER, COLORADO,

        Defendants.

---

## SECOND AMENDED COMPLAINT AND JURY DEMAND

---

      Now comes Plaintiff, Levi Frasier, by and through his attorneys, LOEVY & LOEVY,

and hereby complains of Defendants Christopher L. Evans, Charles C. Jones, John H.

Bauer, Russell Bothwell, John Robledo, and City and County of Denver, Colorado, and

states as follows:

### Introduction

      1.     This is a civil rights action challenging as unconstitutional the Denver

Police Department's warrantless detention of Levi Frasier, as well as the unlawful

seizure and search of his property, premised upon his exercise of his First Amendment

rights in documenting the conduct of police officers performing their official duties in a

public place.

2.     On August 14, 2014, Plaintiff Levi Frasier witnessed Denver police officer Charles Jones punch an unarmed civilian numerous times in the head and trip a heavily pregnant woman, causing her to fall to the ground. At the time Jones punched the civilian, the civilian was restrained on the ground by Officer Christopher Evans, Detective John Bauer, and Sergeant Russell Bothwell.

3.     Believing that the officers were committing illegal acts of misconduct against the unarmed civilian and pregnant woman, Mr. Frasier video-recorded the officers with his Samsung tablet.

4.     The officers knew that Mr. Frasier was either recording or photographing them. After the officers placed the unarmed civilian under arrest, they surrounded Mr. Frasier, threatened him with arrest, and demanded that he turn over his video.

5.     Having done nothing wrong, Mr. Frasier refused to hand over his tablet or video.

6.     Without consent or any lawful justification whatsoever, Officer Evans seized Mr. Frasier's tablet from him and searched it illegally.

7.     The officers' actions violated Mr. Frasier's right under the First Amendment to the United States Constitution to record government officers performing their official duties in public. The First Amendment protects the right to gather, receive, record, and disseminate information on matters of public importance relating to civil liberties and civil rights, including the official actions of police officers in public.

8.     The officers' actions also violated Mr. Frasier's right to be free from illegal searches and seizures under the Fourth Amendment to the United States Constitution.

9.      Plaintiff Levi Frasier now brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights as secured by the United States Constitution, as well as to pursue certain state law claims.

### Jurisdiction

10.     This court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b). All parties reside in this judicial district, and the events giving rise to the claims asserted herein occurred in this judicial district.

### The Parties

12.     Plaintiff Levi Frasier is a citizen of the United States and a resident of Colorado.

13.     Defendant Christopher L. Evans is a citizen of the United States, a resident of Colorado, and was and is an officer in the Denver Police Department. At all relevant times, Defendant Evans was employed by the Denver Police Department and was acting within the scope of his employment and under the color of law.

14.     Defendant Charles C. Jones is a citizen of the United States, a resident of Colorado, and was an officer in the Denver Police Department. Defendant Jones is currently a sergeant in the Denver Police Department. At all relevant times, Defendant Jones was employed by the Denver Police Department and was acting within the scope of his employment and under the color of law.

3

15.     Defendant John H. Bauer is a citizen of the United States, a resident of Colorado, and was and is a detective in the Denver Police Department. At all relevant times, Defendant Bauer was employed by the Denver Police Department and was acting within the scope of his employment and under the color of law.

16.     Defendant Russell Bothwell is a citizen of the United States, a resident of Colorado, and was and is a sergeant in the Denver Police Department. At all relevant times, Defendant Bothwell was employed by the Denver Police Department and was acting within the scope of his employment and under the color of law.

17.     Defendant John Robledo is a citizen of the United States, a resident of Colorado, and was and is a detective in the Denver Police Department. At all relevant times, Defendant Robledo was employed by the Denver Police Department and was acting within the scope of his employment and under the color of law.

18.     Defendant City and County of Denver (the "City") is a Colorado municipal corporation. At all relevant times, it employed Defendants Evans, Jones, Bauer, Bothwell, and Robledo (henceforth collectively referred to as "Defendant Officers"). The City is responsible for the supervision, training, policies, customs and practices of the Denver Police Department.

### Plaintiff Witnesses and Records Police Misconduct

19.     On the morning of August 14, 2014, Plaintiff Levi Frasier drove near the area of West Fifth Avenue and Federal Boulevard in Denver, Colorado.

20.     Mr. Frasier saw two men forcefully pulling a Latino man, David Flores, out of a car in a parking lot in a public area, and he decided to video-record it. These two men were Defendants Bothwell and Bauer.

21.     Mr. Frasier parked his truck, got out, and began video-recording the Defendants' actions with his Samsung tablet.

22.     When he was video-recording the Defendants, Mr. Frasier was standing at a comfortable distance from them. At no time did Mr. Frasier do anything to interfere with or attempt to interfere with the Defendants or their actions.

23.     Defendants Bothwell and Bauer had Mr. Flores restrained on the ground. They appeared to be arresting him.

24.     Two other Denver police officers, Defendants Evans and Jones, joined Defendants Bothwell and Bauer in arresting Mr. Flores.

25.     At some point, there appeared to be something in Mr. Flores's mouth. Defendants Jones, Evans, Bothwell, and Bauer attempted to get the object out of Mr. Flores's mouth. One of the Defendants claimed the object was a sock purportedly containing narcotics.

26.     Mr. Frasier did not have any personal knowledge that Mr. Flores had committed any crime.

27.     While Mr. Flores was held down on the ground by Defendants Evans, Bothwell, and Bauer, Defendant Jones punched Mr. Flores in the face approximately six times. Defendant Jones punched Mr. Flores with such force that his head struck the pavement numerous times, causing serious injury and requiring him to be taken away in

an ambulance. Mr. Flores was unarmed. He was also fully restrained by Defendants
Evans, Bothwell, and Bauer at the time of Defendant Jones's punches, as can be seen
in this still from Mr. Frasier's video:



28.     Nothing Mr. Flores did justified the amount of force Defendant Jones used on him.

29.     At one point during the Defendants' arrest of Mr. Flores, his visibly pregnant girlfriend, Mayra Lazos-Guerrero, stepped forward toward him in an attempt to help him. She posed no threat to any of the Defendant Officers or anyone else.

30.     In response to this, Defendant Jones purposefully grabbed Ms. Lazos-Guerrero by the legs and swept her to the ground, causing her to fall on her belly. Defendant Jones did this even though she was heavily pregnant and posed no threat. Ms. Lazos-Guerrero screamed and cried as she lay on the ground, clutching her belly.

31.     Nothing Ms. Lazos-Guerrero did justified Defendant Jones in tripping her and forcefully taking her down to the ground. Nor did Mr. Frasier have any personal knowledge that Ms. Lazos-Guerrero had committed any crime.

32.     During these events, Mr. Frasier stood at a comfortable remove from the Defendants and openly recorded their actions using his tablet. Mr. Frasier posed no threat to the officers, did not interfere or attempt to interfere with the officers' actions, did not harass them in any way, and did not distract them from conducting their arrest of Mr. Flores.

33.     Mr. Frasier recorded events that were a matter of public concern, given that they involved police officers performing their official duties in public. He did not think that the Defendant Officers' actions were proper, and he felt that such misconduct should be documented.

34.     The Defendant Officers knew that Mr. Frasier was either recording or photographing their use of force on Mr. Flores and Ms. Lazos-Guerrero. At one point, Defendant Evans yelled, "Camera!", while Defendant Jones was punching Mr. Flores in the head.

35.     Mr. Frasier eventually stopped recording, walked over to his truck, and put his tablet safely in his truck.

**Defendant Officers Threaten Plaintiff with Arrest,
Illegally Detain Him, and Illegally Seize and Search His Tablet**

36.     After Mr. Flores's arrest, Defendant Evans or one of the other Defendant Officers asked Mr. Frasier for the video that he had just recorded and asked to see Mr. Frasier's identification.

37.     Mr. Frasier gave this Defendant his identification but not his tablet. He was afraid that the officer wanted to take his tablet or erase his video. Without any reason to suspect that Mr. Frasier had committed or was committing any crime, this Defendant detained Mr. Frasier by telling him that he could not leave until he gave a witness statement. This Defendant then threatened Mr. Frasier with arrest by opening the back door of his squad car and gesturing to the back seat, saying something to the effect of, "we can do this the easy way or the hard way."

38.     Given that Mr. Frasier had just seen the Defendant Officers restrain an unarmed civilian on the pavement and beat him until head was bleeding, he was afraid of the Defendant Officers. The officers had demonstrated that they would not hesitate to cause serious bodily injury to civilians for no justifiable reason. Under these

8

circumstances, and given the fact that one of the Defendant Officers had told Mr.

Frasier that he could not leave until he gave a witness statement, Mr. Frasier was not

free to leave and believed that if he did not give a witness statement, he would be

arrested.

39.     At some point, Defendant Bauer or Bothwell told Defendant Evans

something to the effect of "if it's a picture, it's ok; we only need the video footage."

Defendant Bauer or Bothwell was instructing Defendant Evans to search Mr. Frasier's

tablet.

40.     The Defendant Officers, including Jones, Evans, Bauer, Bothwell, and

Robledo, then conferred with each other. At no time did the Defendant Officers have

any reason to suspect that Mr. Frasier had committed or was committing any crime.

After they conferred, the Defendant Officers agreed with each other to detain Mr.

Frasier and threaten him until he gave them the video.

41.     The only reason the Defendant Officers detained Mr. Frasier and

demanded that he give them the video was because they did not want any evidence of

their misconduct in using excessive force against Mr. Flores and Ms. Lazos-Guerrero to

exist. The Defendant Officers were not interested in detaining Mr. Frasier or taking his

tablet or video for any other reason.

42.     Defendants Evans, Jones, Bothwell, Bauer, and Robledo surrounded Mr.

Frasier in the parking lot, interrogated him about the video, and threatened him with

arrest if he did not produce the video. One or more of them told him something to the

effect of "we know you have that video and if you don't have it, then we'll just take you

down to holding." The Defendant Officers would not allow Mr. Frasier to leave.

43.     Mr. Frasier was threatened, intimidated, and was not free to leave.

Throughout his interaction with the Defendant Officers, he asked more than once

whether he was free to go. Each time, one or more of the Defendant Officers told him,

"No, we're not done yet." The Defendant Officers were also still holding on to his

identification, which he had given to them at the beginning of their interaction.

44.     The only reason the Defendant Officers detained Mr. Frasier was because

they wanted his video. The Defendant Officers did not want there to exist any evidence

of their unlawful and excessive use of force on Mr. Flores and Ms. Lazos-Guerrero. The

Defendant Officers agreed with each other that one of them would illegally search Mr.

Frasier's tablet for the video.

45.     After the Defendant Officers surrounded him and told him that he was

going to jail if he did not produce his video, Defendant Evans escorted Mr. Frasier to his

truck to retrieve his video.

46.     As Defendant Evans escorted Mr. Frasier to his truck, he made further

threats to him. Defendant Evans made a comment about being a police officer and said

something to the effect of, "I tell my friends that when I go to work, I'm the trashman—I

take out the trash."

47.     Mr. Frasier knew that the Defendant Officers wanted to erase his video

evidence of their misconduct. At his truck, he showed Defendant Evans his cell phone

instead of his tablet. Defendant Evans and/or Bothwell said something to the effect of, "no, that's not it."

48.     Mr. Frasier took his tablet from his truck. When Defendant Evans saw it, he said something to the effect of, "That's it, can we have it?" Mr. Frasier said "no."

49.     When Mr. Frasier was holding the tablet in his hands, Defendant Evans grabbed it from him without his permission. Mr. Frasier immediately protested, saying, "Hey, you can't do that, you need a warrant for that!"

50.     Defendant Evans ignored him. Instead, over Mr. Frasier's explicit objection, Defendant Evans said, "What app did you use to take the video?" and began scrolling through Mr. Frasier's tablet, apparently looking for the video. As Defendant Evans searched Mr. Frasier's tablet, Mr. Frasier protested again, saying "you can't do that, you need a warrant."

51.     Defendant Evans either deleted or tried to delete the video from the tablet.

52.     Defendant Evans eventually gave the tablet back to Mr. Frasier. Defendant Evans had no warrant, consent, exigent circumstances, or other lawful justification for seizing or searching Mr. Frasier's tablet.

53.     After he unlawfully searched Mr. Frasier's tablet, Defendant Evans walked over to the other Defendant Officers and conferred with them about what he had done. Only then did the Defendant Officers agree to let Mr. Frasier go.

54.     Mr. Frasier could not find the video on his tablet when Defendant Evans gave the tablet back to him. Fortunately, Mr. Frasier was later able to retrieve the video on his tablet.

55.     At no time did the Defendant Officers ever get a warrant for the video or attempt to make a copy of the video for the purpose of any investigation.

**Plaintiff Shares the Video with the Press**

56.     Mr. Frasier knew that the misconduct that he witnessed on August 14, 2014 was a matter of public concern and importance. He did not, at the time, even know the names of Mr. Flores and Ms. Lazos-Guerrero. Thus, Mr. Frasier eventually provided a copy of his video recording to Fox31 Denver. Fox31 Denver did an investigative report, aired the video on the news, and posted it on its website. Fox31 Denver eventually won an award for its reporting on this incident.

57.     Instead of thanking Mr. Frasier for coming forward to share information about the misconduct of its officers, the Denver Police Department released a statement defending the officers' behavior and unfairly attacking Mr. Frasier's character.

58.     Upon information and belief, the Defendant City and County of Denver (the "City") has failed to discipline any of the Defendant Officers in any way for their unreasonable and unlawful actions. In fact, the City promoted Defendant Jones to sergeant shortly after Mr. Frasier's video was made public.

59.     The City's former Independent Monitor, Richard Rosenthal, has testified that "what I saw, again, was this potential systemic problem where officers were permitted to use inappropriate force on the street, were not held accountable, would lie to Internal Affairs about it and, again, were not held accountable."

12

60.     Mr. Rosenthal has stated that Internal Affairs was "particularly weak on force cases," "too willing to accept any statement from an officer and not willing to follow up to try to ensure whether it was truthful." He also stated that the Denver Police Department "has not established itself to be able to adequately discipline or terminate officers who should not be police officers."

**Importance of Citizen Recordings of the Police**

61.     While most police officers perform their duties in a lawful manner, some police officers abuse their authority. In many cases, the only evidence of what happened during an encounter between police officers and civilians—including whether police officers and/or civilians behaved lawfully—will be the conflicting testimony of police officers and civilians.

62.     Indeed, on many occasions in the last decade, audio/video recordings made by civilians of police-civilian encounters have helped to resolve testimonial disputes about alleged police misconduct. Sometimes these audio/video recordings have tended to disprove allegations of police misconduct, and sometimes they have tended to prove allegations of police misconduct.

63.     Federal, state, and local law enforcement agencies have deployed tens of thousands of audio/video recording devices for purposes of documenting certain interactions between police officers and civilians. For example, many police squad cars are equipped with audio/video recording devices that document traffic stops. Likewise, many officers are equipped with body cams. One law enforcement purpose of these

audio/video recording devices is to deter and detect police misconduct, and to disprove false accusations of police misconduct.

64.     Due in part to Mr. Frasier's video and the press coverage of his video—as well as other instances of local law enforcement, including Denver police, intimidating witnesses who record or attempt to record them—the Colorado legislature recently passed a law that strengthens the rights of citizens to obtain compensation under state law for trying to stop or retaliate against lawful recording of their activities. This law is now codified at C.R.S. § 13-21-128.

65.     The right of citizens to record police officers performing their public duties is so important that the United States Department of Justice (DOJ) has explicitly reinforced this message. It has done so by intervening in at least two recent cases as part of its responsibility to enforce federal civil rights statutes that prohibit state and local law enforcement agencies from engaging in conduct that deprives persons of their rights under the Constitution and laws of the United States. The DOJ has explained, "[t]he right to record police officers while performing duties in a public place, as well as the the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution," they "are consistent with our fundamental notions of liberty, promote the accountability of our government officers, and instill public confidence in the police officers who serve us daily." Statement of Interest of the United States [Dkt. 24], *Sharp v. Baltimore City Police Dep't*, No. 1:11-CV-02888-BEL (D. Md. Jan. 10, 2012) at 1; *see also* Statement of Interest of the United

States [Dkt. 15], *Garcia v. Montgomery County, Maryland, et al.*, 8:12-CV-3592-JFM (D.

Md. Mar. 4, 2013).

**Defendant City's Failure to Provide Any Policies, Training, or Supervision, and the Widespread Practices of Denver Police Officers**

66.     The misconduct described herein was undertaken pursuant to the policy of

the Defendant City and its Police Department in that, at the time of the events in this

case, the City and the Department had inadequate policies guiding Denver police

officers on civilians' First Amendment right to audio or video record officers who are

conducting their official duties in public. In fact, the City's policies were not only

inadequate, but they were non-existent.

67.     For instance, at the time of the events alleged herein, the Operations

Manual for the Police Department of the City and County of Denver contained not a

single policy or statement on whether civilians have the right to record police officers in

public doing their duties; that officers may not interfere with civilians recording or

attempting to record their public performance of their public duties; or that officers may

not unlawfully confiscate, search, or seize civilians' recording devices.

68.     At the time of the events in this case, the City and the Department had no

policies, procedures, rules or regulations relating to: Denver police officers' obligation

not to interfere with civilians' peaceful recording of their official duties in public; civilians'

First Amendment right to record police conducting their official duties in public; or

civilians' right to keep their recordings and recording devices free from unlawful search

and seizure.

69.     The misconduct described herein also was undertaken pursuant to the policy of the Defendant City and its Police Department in that, at the time of the events in this case, the City and the Department had inadequate training and supervision guiding Denver police officers on civilians' First Amendment right to audio or video record officers who are conducting their official duties in public. The City's training and supervision was not only inadequate, but it was non-existent. At all times relevant herein, the City and the Department provided no training or supervision to Denver police officers relating to: their obligation not to interfere with civilians' peaceful recording of their official duties in public; civilians' First Amendment right to record police conducting their official duties in public; or civilians' Fourth Amendment rights to keep their recordings and recording devices free from unlawful search and seizure.

70.     The misconduct described herein was also undertaken pursuant to the policy of the Defendant City and its Police Department in that, at all relevant times herein, the City and the Department had a custom and practice of failing to adequately discipline officers who unlawfully obstructed or prevented members of the public from recording police activity conducted in public, or who unlawfully retaliated against members of the public who recorded police activity in public, despite the City's awareness that these violations happen.

71.     The Defendant City and its Police Department chose not to implement any such policies, training, or supervision even though the need for such policies, training, and supervision is obvious, given the frequency with which police officers conduct their

business in public and the ubiquity of personal electronic devices such as cell phones and tablets equipped with cameras.

72.     At all times relevant herein, the importance of and need for such policies, training, and supervision was known and obvious to the final policymakers of the City and Department. The policymakers for the City and the Department knew of these problems, allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

73.     The constitutional violations complained of by Mr. Frasier were a highly obvious and predictable consequence of a failure to equip Denver police officers with the specific tools—including policies, training, supervision, and discipline—to handle the recurring situation of how to handle civilians who are recording officers in public doing their duties. Knowing that such policies, training, supervision, and discipline were necessary and declining to implement any demonstrates deliberate indifference on the part of the City and its Department toward persons with whom its officers come into contact.

74.     In addition, the misconduct described herein was undertaken pursuant to the policy and widespread practice and custom of the Defendant City and its Department in that, at all times relevant herein, Denver police officers regularly threatened subjects who were about to record them, detained subjects who were recording them, seized the devices used for recording, improperly searched the devices, and/or deleted or attempted to delete the recordings.

75.     For instance, in April 2006, Denver police unlawfully arrested and retaliated against a civilian, Evan Herzoff, who was observing and recording the arrest of another person.

76.     Furthermore, in the immediate aftermath of the Denver police shooting of Jessica Hernandez, a witness, Brianna Diaz, tried to video-record the officers' actions in public while she was standing on her own property. The officers threatened Ms. Diaz and ordered her not to record them. The involved Denver police officers were not disciplined by the Defendant City in Ms. Diaz's case, which effectively sanctioned and endorsed their unconstitutional conduct.

77.     In addition, during an anti-police brutality demonstration in downtown Denver, Denver Police Commander Antonio Lopez unlawfully seized the cell phone of a demonstrator, Jessica Benn, in retaliation for her recording of the police actions in arresting civilians during the demonstration.

78.     The above-described widespread practice was so well-settled as to constitute *de facto* policy in the Denver Police Department, and it was allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

79.     All of the above-described policies and practices of the Defendant City and its Department, individually and collectively, were the moving force behind the misconduct described herein and the violation of Mr. Frasier's rights. If the Defendant City and its Department had provided adequate policies, training, supervision, and/or discipline to its police officers informing them that civilians have a right to record them

doing their duties in public (as long as the civilians were not otherwise interfering with

the officers), the Defendant Officers would not have violated Mr. Frasier's rights in the

manner alleged herein.

80.     It was not until November 2015 that the Defendant City finally created a

policy in the Police Department instructing officers to respect the First and Fourth

Amendment rights of those recording them. This policy, Section 104.58 of the Denver

Police Department Operations Manual, says in part:

> (3) RIGHTS OF THE PUBLIC TO OBSERVE AND RECORD POLICE
>     ACTIVITIES:
>
> Members of the public, including but not limited to media representatives and
> bystanders, have a First Amendment right to observe and record officers in
> public places, as long as their actions do not interfere with the officer's duties or
> the safety of officers or others. Officers should assume that they are being
> recorded at all times when on-duty in a public space. …
>
>> a.  Persons who are in public spaces or locations where they have a legal
>>     right to be present—such as … parks and sidewalks, have a First
>>     Amendment right to record things in plain sight or hearing, to include
>>     police activity.
>>
>> b.  Officers may not threaten or intimidate individuals who are recording
>>     police activities, nor will they discourage or interfere with the recording
>>     of police activities. …
>
> (5) SEARCH AND SEIZURE OF RECORDING DEVICES AND MEDIA—
>     OFFICER AND SUPERVISOR RESPONSIBILITIES:
>
>> a.  Warrant requirement: Absent the arrest of the recording party,
>>     recording equipment and media may not be confiscated without a
>>     warrant or exigent circumstances. …

81.     The Defendant City, through its own written policy adopted in November

2015, acknowledges that members of the public have a First Amendment right to record

police performing their duties in public, as long as their actions do not interfere with the duties of the officers or the safety of officers or others.

82.     The Defendant City did not adopt Section 104.58 in response to any change in First Amendment case law between August 2014 and November 2015.

83.     There was no change in controlling First Amendment case law between August 2014 and November 2015 concerning the First Amendment right of members of the public to record police performing their duties in public, as long as their actions do not interfere with the duties of the officers or the safety of officers or others.

84.     The fact that the Defendant City adopted this policy (Section 104.58 of the DPD Operations Manual) shows that final policymakers knew that this was a subject matter on which policy, instruction, training, supervision, and discipline of its officers was needed. The failure of the Defendant City to adopt any policy, training, supervision, or discipline on this topic prior to the events at issue shows that it was deliberately indifferent to the likelihood that civilians' constitutional rights would be violated.

## Legal Claims

## Count I: 42 U.S.C. § 1983 – First Amendment

85.     Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

86.     In the manner described more fully above, Defendant Officers, under color of law and within the scope of their employment, violated Plaintiff's rights as secured by

the First Amendment of the U.S. Constitution. Plaintiff's act of recording the Defendant Officers constituted protected speech and expression under the First Amendment.

87.     The right to gather, receive, record, and disseminate information is grounded in the Free Speech Clause of the First Amendment. This right is further grounded in:

    a.     The Petition Clause of the First Amendment, if the purpose of gathering, receiving, or recording the information is to use it to petition government for redress of grievances; and

    b.     The Free Press Clause of the First Amendment, if the purpose of the gathering, receiving, or recording the information is to publish and disseminate it to other people.

88.     This First Amendment right to gather, receive, record, and disseminate information includes the right to audio and video record police officers performing their duties in public.

89.     Police officers performing their public duties in public places have no reasonable expectation that their conduct is private and will not be recorded, published, and disseminated.

90.     In the manner described more fully above, Defendants' actions in harassing, intimidating, threatening, and unlawfully detaining Plaintiff, as well as unlawfully searching his property, caused him injury that would chill a person of ordinary firmness from continuing to engage in protected activity.

91.     In the manner described more fully above, Defendants' actions were substantially motivated as a response to Plaintiff's constitutionally protected activity. Defendants would not have harassed, intimidated, threatened, or unlawfully detained Plaintiff, or unlawfully searched his property, in the absence of his protected activity.

92.     In the manner described more fully above, the misconduct described in this Count was undertaken pursuant to the policies and practices of the Defendant City and its Department.

93.     In the manner described more fully above, the policies and practices of the Defendant City and its Department were the moving force behind the misconduct described in this Count and the violation of Plaintiff's rights.

94.     The Defendant City is liable because the violation of Plaintiff's rights as described in this Count was caused by the policies, practices, or customs of the relevant policymakers for the City.

95.     In the manner described more fully above, in light of the frequency with which officers conduct their official duties in public and the ubiquity of personal electronic devices with cameras, the need for policies, training, and supervision of Denver police officers on how to interact with civilians who are recording them was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the Defendant City can reasonably be said to have been deliberately indifferent to the need.

96.     As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated, entitling him to declaratory relief. Plaintiff also

suffered damages, entitling him to compensatory damages against the Defendants. Plaintiff is also entitled to punitive damages against the Defendant Officers to redress their willful, malicious, wanton, and reckless conduct in violation of Plaintiff's civil rights.

### Count II: 42 U.S.C. § 1983 – Fourth Amendment

97.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

98.    In the manner described more fully above, Defendant Officers, under color of law and within the scope of their employment, violated Plaintiff's rights against unreasonable searches and seizures to his person and property as secured by the Fourth Amendment of the U.S. Constitution.

99.    Specifically, Defendant Evans seized and searched Plaintiff's tablet without his consent, a warrant, probable cause, reasonable suspicion, exigent circumstances, or any legal justification whatsoever.

100.    As described more fully above, Defendant Evans committed these acts after discussion with and in agreement with the other Defendant Officers.

101.    No Defendant at any time had a warrant authorizing any seizure or search of Plaintiff's tablet.

102.    No Defendant at any time had probable cause or reasonable suspicion, or any other legally valid basis, for seizing or searching Plaintiff's tablet.

103.    No Defendant at any time had Plaintiff's consent to seize or search Plaintiff's tablet.

104.    In the manner described more fully above, Defendants Jones, Evans, Bauer, Bothwell, and Robledo detained Plaintiff without his consent, a warrant, reasonable suspicion or probable cause to believe that he had committed any crime, and without any legal justification whatsoever.

105.    No Defendant at any time had probable cause or reasonable suspicion, or any other legally valid basis, to believe that Plaintiff had committed or was committing any violation of the law prior seizing and continuing to restrain his person.

106.    No Defendant at any time had a reasonable basis for believing that Plaintiff was a danger to himself or others.

107.    No Defendant at any time had a warrant authorizing any such seizure of Plaintiff's person.

108.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated, entitling him to declaratory relief. Plaintiff also suffered damages, entitling him to compensatory damages against the Defendants. Plaintiff is also entitled to punitive damages against the Defendant Officers to redress their willful, malicious, wanton, and reckless conduct in violation of Plaintiff's civil rights.

## Count III: 42 U.S.C. § 1983 – Failure to Intervene

109.    Plaintiff incorporates each Paragraph of the Complaint as if restated fully herein.

110.    In the manner described more fully above, during the constitutional violations described herein, one or more of the Defendant Officers stood by without

24

intervening to prevent the violation of Plaintiff's rights under the First and Fourth Amendments, even though they had the opportunity to do so.

111.    Specifically, as alleged in more detail above, the Defendant Officers agreed to harass, intimidate, threaten, and unlawfully detain Plaintiff until he produced his tablet so that one of them could unlawfully search it. Right after Defendants Jones, Evans, Bauer, Bothwell, and Robledo surrounded Plaintiff in the parking lot, Defendant Evans escorted Plaintiff to his truck, after which he unlawfully seized and searched Plaintiff's tablet over his explicit objection.

112.    The Defendant Officers knew that Defendant Evans' purpose in escorting Plaintiff to his truck was to illegally seize and search his tablet, in retaliation for Plaintiff's exercise of his constitutionally protected right to record them during their arrest of David Flores.

113.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

114.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated, entitling him to declaratory relief. Plaintiff also suffered damages, entitling him to compensatory damages against the Defendants. Plaintiff is also entitled to punitive damages against the Defendant Officers to redress their willful, malicious, wanton, and reckless conduct in violation of Plaintiff's civil rights.

**Count IV: 42 U.S.C. § 1983 – Civil Conspiracy**

115.    Plaintiff incorporates each Paragraph of the Complaint as if restated fully herein.

116.    In the manner described more fully above, the Defendant Officers, acting in concert with each other and other co-conspirators, known and unknown, reached an agreement among themselves to unlawfully search and seize Plaintiff's tablet, unlawfully seize Plaintiff's person, and retaliate against him for his protected expressive activity under the First Amendment, thereby depriving him of his constitutional rights.

117.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves and took concerted action to protect one another from liability by depriving Plaintiff of these rights.

118.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

119.    The Defendant Officers were acting under color of law and within the scope of their employment when they took these actions.

120.    As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights, entitling him to declaratory relief. Plaintiff also suffered damages, entitling him to compensatory damages against the Defendants. Plaintiff is also entitled to punitive damages against the Defendant Officers to redress their willful, malicious, wanton, and reckless conduct in violation of Plaintiff's civil rights.

**Count V: Colorado State Law – Trespass to Chattels**

121.    Plaintiff incorporates each Paragraph of the Complaint as if restated fully herein.

122.    In the manner described more fully above, Defendant Evans violated Plaintiff's rights under state law by committing trespass to chattels. Defendant Evans intentionally interfered with the possession, or physical condition, of a chattel in the possession of Plaintiff, without justification.

123.    As a direct and proximate result of Defendant Evans' willful and wanton conduct, Plaintiff's rights under state law were violated and he suffered damages, entitling him to compensatory damages.

124.    Defendant Evans was acting within the scope of his employment when he intentionally committed such willful and wanton acts and omissions that created an unreasonable risk of proximately causing Plaintiff damage.

125.    There is no cap under the Colorado Governmental Immunity Act (C.G.I.A.) on Plaintiff's state common law trespass to chattels claim, as Defendant Evans' acts and omissions in this case were willful and wanton within the meaning of C.R.S. § 24-10-118.

126.    Timely notice of claims under the C.G.I.A. has been given by Plaintiff with respect to the willful and wanton conduct alleged in this Complaint, which also violates state law under C.R.S. § 24-10-118 and Colorado common law.

**Count VI: Colorado State Law – Intentional Infliction of Emotional Distress**

127.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

128.    In the manner described more fully above, Defendant Officers violated Plaintiff's rights under state law by committing intentional infliction of emotional distress. The Defendant Officers engaged in extreme and outrageous conduct; engaged in such conduct recklessly or with the intent of causing Plaintiff severe emotional distress; and the Defendant Officers' conduct caused the Plaintiff to suffer severe emotional distress.

129.    As a direct and proximate result of Defendant Officers' willful and wanton conduct, Plaintiff's rights under state law were violated and he suffered damages, entitling him to compensatory damages.

130.    Defendant Officers were acting within the scope of their employment when they intentionally committed such willful and wanton acts and omissions that created an unreasonable risk of proximately causing Plaintiff damage.

131.    There is no cap under the Colorado Governmental Immunity Act (C.G.I.A.) on Plaintiff's state common law intentional infliction of emotional distress claim, as Defendant Officers' acts and omissions in this case were willful and wanton within the meaning of C.R.S. § 24-10-118.

132.    Timely notice of claims under the C.G.I.A. has been given by Plaintiff with respect to the willful and wanton conduct alleged in this Complaint, which also violates state law under C.R.S. § 24-10-118 and Colorado common law.

**Count VII: Colorado State Law – *Respondeat Superior***

133.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

134.    While committing the acts alleged in the preceding paragraphs, Defendant Officers were employees and agents of the Defendant City and County of Denver, acting at all relevant times within the scope of their employment.

135.    While committing the acts alleged in the preceding paragraphs, the behavior of the Defendant Officers was calculated to facilitate and/or promote the business for which they were employed by their employer, Defendant City and County of Denver.

136.    Defendant City and County of Denver is liable as principal for all state law torts committed by its agents.

**Count VIII: Colorado State Law – Indemnification**

137.    Plaintiff incorporates each paragraph of this Complaint as if restated fully herein.

138.    Colorado law provides that the Defendant City and County of Denver is directed to pay any judgment for compensatory damages for which its employees are liable within the scope of their employment activities.

139.    The Defendant Officers were employees of the Defendant City and County of Denver and acted within the scope of their employment at all times relevant in committing the actions and omissions described herein.

WHEREFORE, Plaintiff, Levi Frasier, respectfully requests that this court enter judgment in his favor and against Defendants Christopher L. Evans, Charles C. Jones, John H. Bauer, Russell Bothwell, John Robledo, and City and County of Denver, awarding him:

a) A declaratory judgment that Plaintiff's expressive activity of recording the Defendant Officers performing their official duties in a public place was constitutionally protected under the First Amendment, that Plaintiff's First Amendment right was violated by the Defendants, and that this First Amendment right was clearly established as of August 14, 2014;

b) A declaratory judgment that Plaintiff's rights under the Fourth Amendment to be free from unlawful search and seizure of his person and property were violated by the Defendants, and that these rights were clearly established as of August 14, 2014;

c) Compensatory damages against all Defendants;

d) Punitive damages on his federal claims only against Defendant Officers;

e) Attorneys' fees and costs on all federal and state law claims as allowed by law; pre- and post-judgment interest at the lawful rate; and any further relief as this court deems just and appropriate.

## JURY DEMAND

Plaintiff, Levi Frasier, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(c) on all issues so triable.

Respectfully submitted,

LEVI FRASIER

By:   <u>s/ Elizabeth Wang</u>
One of Plaintiff's Attorneys

Daniel M. Twetten
Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Ste. 460
Boulder, CO 80302
720.328.5642 (O)
312.243.5902 (F)
dan@loevy.com
elizabethw@loevy.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Elizabeth Wang, an attorney, hereby certify that on August 4, 2016, I filed the foregoing via CM/ECF, thereby providing electronic service to all counsel of record.

s/ Elizabeth Wang
One of Plaintiff's Attorneys