**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 15-cv-01759-REB-KLM

LEVI FRASIER,

      Plaintiff,

v.

Denver Police Officers CHRISTOPHER L. EVANS, #05151,
CHARLES C. JONES, #04120,
JOHN H. BAUER, #970321,
RUSSELL BOTHWELL, #94015,
JOHN ROBLEDO, and
CITY AND COUNTY OF DENVER, COLORADO,

      Defendants.

---

### ORDER RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

**Blackburn, J.**

    The matter before me is **Defendants' Motion for Partial Summary Judgment** [#96],[1] filed July 30, 2018.  I grant the motion in part and deny it in part.

### I.  JURISDICTION

    I have jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question).

### II.  STANDARD OF REVIEW

    Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  **FED. R. CIV. P.** 56(a);

---

[1]  "[#96]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF).  I use this convention throughout this order.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

(1986).  A dispute is "genuine" if the issue could be resolved in favor of either party.

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d

1131, 1135 (10th Cir. 1994).  A fact is "material" if it might reasonably affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of

a genuine factual dispute.  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d

1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995).  Once the motion has

been properly supported, the burden shifts to the nonmovant to show, by tendering

depositions, affidavits, and other competent evidence, that summary judgment is not

proper.  *Concrete Works*, 36 F.3d at 1518.  All the evidence must be viewed in the light

most favorable to the party opposing the motion.  *Simms v. Oklahoma ex rel.*

*Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1326

(10th Cir.), *cert. denied*, 120 S.Ct. 53 (1999).

### III.  ANALYSIS

This lawsuit arises from an arrest involving the defendant officers to which

plaintiff was a percipient witness.  Because the motion implicates distinct claims against

the defendant officers, on the one hand, and the City and County of Denver, on the

other, I discuss them independently.

### A.  CLAIMS AGAINST INDIVIDUAL OFFICER DEFENDANTS

1. <u>Factual background</u>.

On August 14, 2014, Detective John Bauer was conducting surveillance of the parking lot of a Walgreens near the corner of Alameda Boulevard and Federal Boulevard in Denver, Colorado, where drug transactions were known to occur.  He witnessed what he believed to be a drug deal involving a silver sedan.  He "called out" the suspected drug transaction, and Officers Charles Jones and Christopher Evans responded.  Detective Bauer then followed the vehicle as it exited the parking lot.

The car subsequently pulled into a parking lot near the corner of Fifth Avenue and Federal Boulevard, and Detective Bauer pulled in beside it.  Detective Bauer (who was in plainclothes) got out and approached the sedan, announcing "police."  The driver, later identified as David Flores, refused the detective's commands to show his hands and reached toward his waistband.  Detective Bauer pulled Mr. Flores from the car and pinned him up against it, holding his left arm.  At that point, Sergeant Russell Bothwell, also in plainclothes, had arrived on the scene and was attempting to gain control of plaintiff's right arm.

Despite these efforts, Mr. Flores managed to retrieve a sock, which the officers believed to contain contraband, stashed in the waistband of his pants and stuffed it in his mouth.  As he struggled with the officers, all three fell to the ground.  Although Detective Bauer's right arm was pinned beneath Mr. Flores's chest, he managed to get hold of the sock and ordered Mr. Flores to "spit it out."  During the struggle, Detective Bauer was able to access his radio, and repeated his request that uniformed officers respond to the scene.

Around this time, Detective Bauer noticed plaintiff, Levi Frasier, standing nearby. Detective Bauer, who was losing his grip on the sock, asked Mr. Frasier "Help us."  After confirming that Detective Bauer was a police officer, Mr. Frasier stepped forward and grabbed the sock briefly before other uniformed officers began to arrive and Sergeant Bothwell asked Mr. Frasier to step back.  Mr. Frasier moved about ten feet away and began recording the incident with a tablet.

Meanwhile, Officers Jones and Evans arrived on the scene and began to assist in the effort to control Mr. Flores.  Officers repeatedly ordered Mr. Flores to spit out the sock, but he failed to comply.  Just as Mr. Frasier began filming, Officer Jones punched Mr. Flores in the face six times in rapid succession.  As Mr. Flores finally relinquished the sock, Sergeant Bothwell called out "Camera."

While the officers continued to struggle to gain control of Mr. Flores, a woman approached the group, screaming.  Officer Jones stood, reached out, and pushed the woman by the shoulder, while Officer Evans, who was then on the ground with Mr. Flores, grabbed her ankle and pulled her off her feet, knocking her to the ground.  The officers then were able to handcuff Mr. Flores.

Mr. Frasier ceased filming,[2] returned to his parked work van, and hid the tablet under some tools in the back seat.  At his deposition, Mr. Frasier testified he was afraid officers would make the video "disappear" because it showed, in his estimation, misconduct by the officers.

_____

[2]  Although Mr. Frasier left the device on "record" until he returned to his van, but he did not actually record anything thereafter.

4

Aware that Mr. Frasier was a witness to the incident, Officer Evans followed him to his van and told him to bring his identification and the video to the squad car. After pausing for ten to fifteen seconds,[3] Mr. Frasier walked back to the car carrying his drivers license but not the tablet. When Officer Evans asked where the video was, Mr. Frasier did not respond. Officer Evans said he needed to get a witness statement from Mr. Frasier. While taking some paperwork from the back seat of his car, Officer Evans allegedly inquired "Are you sure you don't have the video?" Mr. Frasier claimed he did not. According to Mr. Frasier, Officer Evans responded "Well, we could do this the easy way or we could do this the hard way," gesturing toward the back seat of the police car. Mr. Frasier testified he felt, subjectively, that Officer Evans was threatening to take him to jail if he did not produce the video.[4] Yet he also agreed that Officer Evans remained friendly toward him and that "those could have been just words."

Nevertheless, Officer Evans did not pursue the issue of the video at that time. Instead, he handed Mr. Frasier a form on which to give a written witness statement. Plaintiff wrote, "Saw officers taking man to ground. Asked for help. As I came to help, punched[5] me away and the cops showed up." Officer Evans read the statement and told Mr. Frasier it did not contain sufficient detail. Mr. Frasier then put the word

---

[3] Before following Officer Evans, Mr. Frasier sat down in his van and lit a cigarette. Questioned as to why he took time to do this when he had just been directed by Officer Evans to follow him, Mr. Frasier testified "[i]t wasn't like I was under arrest. He didn't – you know, I mean, he just asked me to come up to the car."

[4] Defendants maintain I should disregard this testimony because the HALO surveillance camera video directly contradicts it. Yet the video, which does not have audio, is far from conclusive in this regard.

[5] Mr. Frasier later explained that the officers did not punch him, and he thought the word should have been "pushed." Nevertheless, he admitted the officers did not make physical contact with him but merely asked him to step back.

"officers" in parentheses and added the word "plainclothes" before it.  Officer Evans

then took the statement from Mr. Frasier and wrote a series of questions underneath

Mr. Frasier's words, to which Mr. Frasier provided written answers, each of which he

subsequently initialed:

> Q.  Did you see the officers do anything inappropriate?
> A.  No.
>
> Q.  Did the officers stop using force as soon as they had the
> suspect in custody?
> A.  Yes.
>
> Q.  Did you take video footage of the incident?
> A.  A Snapchat.
>
> Q.  Is the Snapchat footage still on your phone?
> A.  Snapchat removes as soon as you send.
>
> Q.  Did you send the Snapchat footage?  If so, who did you
> send it to?
> A.  Ali Quinn's.  Snapchat name Trashman_555
>
> Q.  Was the footage still photo or video footage?
> A.  Photo.

As Mr. Frasier acknowledged, none of his answers were true.  Mr. Frasier testified he

was concerned that, had he given truthful answers, "I would have been incarcerated

and the video that I took would be taken away and everything that I just saw would be

for naught."

After Mr. Frasier completed his written statement, another, unidentified officer

asked him where the video was.  Although Mr. Frasier denied having a video, the officer

allegedly said "We saw you videotaping it."  Officer Evans then told Mr. Frasier to get

his phone, and Mr. Frasier went to his van and retrieved his cell phone.  As he returned,

another unidentified officer said "That's not it" and indicated Mr. Frasier's recording

device had been larger.  Mr. Frasier then claimed, again falsely, that the phone was all he had.

At this point, as can be seen on the HALO surveillance video, Officer Evans and Sergeant Bothwell approached plaintiff as he stood near the rear door of a squad car. Detective Bauer and Officer John Robledo quickly joined them.  The four officers initially stood together, two front, two behind, facing Mr. Frasier just off to his right.  Just a few seconds later, however, Officer Jones came around the back of the car and stood behind Mr. Frasier to his left.  Almost immediately thereafter, Detective Bauer moved from his spot behind Officer Evans, circled around the group, and stood behind Mr. Frasier.  Thus, for a moment, Mr. Frasier was encircled by the five officers.

Mr. Frasier stated this interaction with the officers was "not the friendliest," and the HALO video could be interpreted as supporting that characterization.  The officers stood in close proximity to Mr. Frasier, who can be seen shaking his head vigorously. Mr. Frasier testified the officers repeatedly demanded his tablet, telling him they "needed to have it" and that it would be in the "best interest of the Denver Police Department and everyone involved" for Mr. Frasier to provide the video.  Shortly after Officer Bauer moved from his position behind Mr. Frasier, Mr. Frasier apparently conceded to the officers' demands.  He testified "it was very clear at that point that if I didn't show them the tablet that they knew that I had, I felt that I was going to be going to jail."

Mr. Frasier retrieved his tablet, intending to show it to the officers but not let them take possession of it.  Initially, Mr. Frasier showed Officer Evans an unrelated video. The HALO video shows Mr. Frasier holding the tablet while Officer Evans looks over his

7

shoulder.  The officer shielded the screen with a piece of paper, apparently unable to see the video because of the glare.  Officer Evans and Mr. Frasier then ducked behind the open hatchback of a nearby SUV and were mostly hidden from view.

Mr. Frasier claims that shortly after moving to this position, Officer Evans grabbed the tablet from him and started scrolling through it, searching for the video and repeatedly asking Mr. Frasier where the video was.  Mr. Frasier claims he protested the officer could not look through his tablet without a warrant.  Although the video does not show any other officer in close proximity to Officer Evans and Mr. Frasier, Mr. Frasier maintains Officer Evans called back over his shoulder "I don't see the video in here.  I can't find it," to which an unidentified person responded "As long as there's no video, it's okay."  Mr. Frasier testified Officer Evans held the tablet for 30 to 45 seconds, although the HALO video shows the two stood behind the SUV for a period of nearly four minutes.[6]

As seen on the video, Officer Evans then stepped out from behind the vehicle and briefly conferred with Sergeant Bothwell and two other officers, holding Mr. Frasier's written statement in his hand.  The officers appeared to review the statement, and then Officer Evans placed it against the window of the SUV and wrote something on it.  He then went back behind the SUV again, where Mr. Frasier is still standing.  Mr. Frasier testified Officer Evans then asked him whether he had anything else to say, and

---

[6] Approximately two minutes into this portion of the video, a uniformed officer can be seen detaching from a group of officers speaking to the woman who previously had been knocked to the ground and joining Officer Evans and Mr. Frasier behind the SUV.  The officer remained there for approximately 40 seconds, then headed in the opposite direction from which he came.  Although Sergeant Bothwell was standing in that vicinity speaking to another uniformed officer, the first officer walked past them and did not appear to converse with them.

Mr. Frasier asked if he could go.  He was told he could, and Officer Evans returned his identification, thanked him, and shook his hand.  Mr. Frasier then left.  Approximately 23 minutes elapsed between the time Officer Evans first approached Mr. Frasier following the arrest and the time Mr. Frasier departed the scene.

Mr. Frasier testified he later was unable to find the video on his tablet, and in subsequent interviews with members of the media, he claimed Officer Evans had deleted it.  Those reports caused the Denver Police Department's ("DPD") Internal Affairs Bureau to launch an investigation, in connection with which Mr. Frasier surrendered the tablet for forensic analysis.  That analysis revealed the video was still present on the device and had never been deleted.

2. Legal analysis

Mr. Frasier claims these facts, viewed in the light most favorable to him, present triable issues of fact as to whether the individual officers violated his Fourth Amendment rights, failed to intervene in the violation of his constitutional rights, and engaged in a conspiracy to violate his constitutional rights.  The defendant officers counter they are entitled to qualified immunity as to these claims because they did not violate Mr. Frasier's constitutional rights in these respects and/or because it was not clearly established that their alleged conduct was constitutionally impermissible.

Under federal law, a state official is immune from civil liability unless his actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Herring v. Keenan*, 218 F.3d 1171, 1175 (10th

Cir. 2000), *cert. denied*, 122 S.Ct. 96 (2001).  To overcome this immunity, Mr. Frasier

must establish both that each defendant violated his rights under federal law and that

such rights were clearly established at the time of the violation.  *Greene v. Barrett*, 174

F.3d 1136, 1142 (10th Cir. 1999).

### a. *Fourth Amendment claims not at issue*

Before examining the claims against the individual officers, I note which aspects

of those claims are not presently before me.  Defendants concede Mr. Frasier's

testimony is sufficient to create genuine disputes of material fact as to whether Officer

Evans permissibly seized and searched Mr. Frasier's tablet.  They thus do not seek

summary judgment as to those claims.  (*See* **Motion** at 2 n.1.)  For his part, Mr. Frasier

does not oppose the dismissal of his unlawful detention claims against Sergeant

Bothwell, Detective Bauer, and Officers Jones and Robledo.  (*See* **Plf. Resp.** at 16.)

Accordingly, these defendants are entitled to summary judgment as to that claim.

With those clarifications, I turn to the claims implicating the individual officers

which do remain contested.

### b. *Fourth Amendment claims at issue*

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

**U.S. CONST**. amend. IV.  Mr. Frasier claims Officer Evans violated his rights under the

Fourth Amendment by unlawfully seizing or detaining him without reasonable suspicion

or probable cause.  He further alleges all the officer defendants unlawfully searched his

tablet in violation of the Fourth Amendment.  I examine these issues in turn.

(1)  **Seizure**

"The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals."  ***United States v. Mendenhall***, 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (citation and internal quotation marks omitted).  The Tenth Circuit has recognized three categories of police-citizen encounters:

> (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause.

***United States v. Ringold***, 335 F.3d 1168, 1171-72 (10th Cir.) (quoting ***United States v. Torres–Guevara***, 147 F.3d 1261, 1264 (10th Cir.1998), ***cert. denied***, 124 S.Ct. 589 (2003) (internal quotation marks and citation omitted).  "These categories are not static.  A consensual encounter may escalate into an investigative detention.  An investigative detention may escalate into a full-blown arrest, or it may de-escalate into a consensual encounter."  ***United States v. Shareef***, 100 F.3d 1491, 1500 (10th Cir. 1996).

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed he was not free to leave, decline the officers' requests or otherwise terminate the encounter."  ***Reeves v. Churchich***, 484 F.3d 1244, 1259 (10th Cir. 2007), ***cert. denied***, 128 S.Ct. 1219 (2008).  An officer need not use physical force to

11

effectuate a seizure; requiring submission to a show of authority which a reasonable person would not have felt free to refuse and to which the plaintiff actually submits also constitutes a seizure. *United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017), *cert. denied*, 138 S.Ct. 2649 (2018). Factors which may be relevant to that determination include, but are not limited to:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*Ringold*, 335 F.3d at 1172. This list is not exhaustive, however, and no single factor is dispositive. *United States v. Hill*, 199 F.3d 1143, 1148 (10th Cir. 1999), *cert. denied*, 121 S.Ct. 83 (2000).

The Tenth Circuit has recognized, however, that "[i]t is hardly obvious. . . how to determine whether a reasonable innocent person would feel free to leave or to decline a request:"

> For a variety of reasons, most people will not "feel" free to leave or refuse a request when confronted by a police officer. After all, "'[i]mplicit in the introduction of the officer and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond.'" Thus, "if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment Seizure."

*Id.* at 1130 (internal citations omitted). The Tenth Circuit has found "[t]he common thread" in Supreme Court precedents on this subject "is that a reasonable person would

not feel coerced when officers are simply engaging in reasonable actions to conduct a consensual encounter." *Id.* at 1132.  Conversely, "if the officers are not taking actions inconsistent with seeking a consensual encounter – such as using a siren or emergency lights, brandishing weapons, or speaking peremptorily – a reasonable person would feel free to refuse to cooperate." *Id.* at 1132.

Officer Evans maintains Mr. Frasier was not seized and, even if he was, his seizure was a permissible investigatory detention based on reasonable suspicion that Mr. Frasier made a false report to the police.  Although genuine (albeit narrow) disputes of material fact may exist as to whether Mr. Frasier was seized, I ultimately find and conclude that Officer Evans had reasonable suspicion to detain him and thus is entitled to summary judgment on this claim.

Viewing the evidence in the light most favorable to Mr. Frasier, this case presents a scenario in which in many respects, the coerciveness *vel non* of Mr. Frasier's encounter with the police waxed and waned.  Although Mr. Frasier claims the threatening presence of several officers and their "aggressive" language are relevant here, the evidence of such is limited to two relatively brief interludes – initially when Officer Evans allegedly told Mr. Frasier "we could do this the easy way or the hard way" while gesturing toward the rear of the squad car (although admittedly in a friendly voice), and later when Mr. Frasier was briefly surrounded by the officers just prior to agreeing to turn over his tablet for inspection.  After each of these incidents, however, the situation appeared to de-escalate to a degree.

13

Nevertheless, the fact remains that, having permissibly asked for Mr. Frasier's driver's license initially,[7] Officer Evans then retained it for the entirety of their twenty-three minute encounter without ever indicating to Mr. Frasier that he was free to leave.[8] "[T]here is generally a seizure when officers retain the civilian's property with no indication that he or she can have it back before complying with the officers' requests." *Id.* at 1130 (citing ***Florida v. Royer***, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion).  In light of that fact, the other, more fleeting instances of potentially coercive police conduct could take on a different cast and could permit a reasonable jury to conclude that, by the time Mr. Frasier agreed to relinquish his tablet, a reasonable person would not have felt free to decline the officers' requests.[9]

Nevertheless, even if a jury were to determine Mr. Frasier was seized, I find and

---

[7]  Officer Evans's initial request that Mr. Frasier produce his identification and recording device, whether phrased as a request or a demand, did not constitute a seizure in and of itself.  ***Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County***, 542 U.S. 177, 185, 124 S.Ct. 2451, 2458, 159 L.Ed.2d 292 (2004).  ***See also I.N.S. v. Delgado***, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) ("While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response."); ***Florida v. Royer***, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (request and examination of defendant's airline tickets and driver's license were "permissible in themselves").

[8]  Officer Evans makes much of the fact that Mr. Frasier never asked to leave.  The law, however, does not place the onus of inquiry on the person being questioned.  ***Cf. United States v. Craighead***, 539 F.3d 1073, 1087 (9th Cir. 2008) ("If a law enforcement officer informs the suspect that he is not under arrest, that statements are voluntary, and that he is free to leave at any time, this communication greatly reduces the chance that a suspect will reasonably believe he is in custody.")  Moreover, Mr. Frasier did tell both Sergeant Bothwell and Officer Evans he needed to get to work.  Rather than inform Mr. Frasier he was free to leave or offer him back his driver's license, Officer Evans instead told Mr. Frasier he would "get [Mr. Frasier] out of there as soon as I can."

[9]  I reject the suggestion that Mr. Frasier was not seized because he did not actually comply with the officer's requests.  A show of authority constitutes a seizure when the person signals his submission to that authority.  ***See Roberson***, 842 F.3d at 1122.  Yet ***Roberson*** and the precedents on which it was based are factually distinguishable.  There, the party seized had taken physical actions which were clearly not in compliance with the officers' orders.  ***See id.***  By contrast, whatever his unspoken, subjective intentions regarding compliance, Mr. Frasier ultimately did produce his tablet.

conclude his seizure was a permissible investigatory detention because Officer Evans had reasonable suspicion based on articulable facts that Mr. Frasier made a false report to the police.[10]   *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).  Specifically, section 18-8-111 of the Colorado Revised Statutes makes it a crime, *inter alia*, for a person to "make[] a report or knowingly cause[] the transmission of a report to law enforcement authorities pretending to furnish information relating to an offense or other incident within their official concern when he or she knows . . . the information is false."  § 18-8-111(1)(a)(III), C.R.S.  *See also People v. Blue*, 253 P.3d 1273, 1278 (Colo. App. 2011) ("The crime of false reporting penalizes those who provide untruthful information to public officials[.]").  Here, Mr. Frasier made both written and oral representations, *see People v. Thompson*, 413 P.3d 306, 323 (Colo. App. 2017), to Officer Evans which he acknowledges were false.[11]  Nevertheless,

---

[10]  The Tenth Circuit also has addressed the circumstances under which an officer may detain a witness not suspected of a crime for questioning in *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006):

> The detention of a potential witness to a crime must satisfy the Fourth Amendment's reasonableness requirement.  In judging reasonableness, courts apply a balancing test that looks to the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. . . .  At a minimum, officers had a right to identify witnesses . . , to obtain the names and addresses of such witnesses, and to ascertain whether they were willing to speak voluntarily with the officers.

*Id.* at 1148 (internal citations and quotation marks omitted).  *See also Illinois v. Lidster*, 540 U.S. 419, 427-28, 124 S.Ct. 885, 891, 157 L.Ed.2d 843 (2004); *Davis v. Mississippi*, 394 U.S. 721, 727 n. 6, 89 S.Ct. 1394, 1397 n.6, 22 L.Ed.2d 676 (1969); *Maxwell v. County of San Diego*, 708 F.3d 1075, 1083-85 (9th Cir. 2013); *Figg v. Schroeder*, 312 F.3d 625, 636 (4th Cir. 2002).  Because neither party relies on this line of authority, I do not consider it here, although I note it is simply a slightly different articulation of the reasonableness standard that guides analysis of all police-citizen encounters under the Fourth Amendment.

[11]  It is of no relevance that Mr. Frasier was asked to make a report by Officer Evans, rather than initiated it himself.  Once he ostensibly agreed to provide a report, he was obliged to provide a truthful one.

Mr. Frasier argues his statements first denying he possessed any recorded evidence of the arrest and later claiming he had only taken a photo were not an "incident" within the "official concern" of the officers.  I cannot agree with this cramped construction of the statute.

"Typically, statutory language is given its 'ordinary, everyday' meaning, unless the context suggests otherwise."  *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1212-13 (10th Cir. 2018); *Daniel v. City of Colorado Springs*, 327 P.3d 891, 894 (Colo. 2014).  Mr. Frasier's recording of Mr. Flores's arrest certainly constitutes an "other incident" within the realm of their "official concern" surrounding the arrest itself.  Indeed, the video constituted potential evidence possibly relevant to any subsequent criminal proceeding involving Mr. Flores.  Moreover, even if it were unclear how the statute should be interpreted, Mr. Frasier does not address, much less present authority regarding, the glaring absence of prior legal authority on this issue, which necessitates a finding that the law was not clearly established in any event.  *See Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).[12]

I thus find and conclude Officer Evans is entitled to qualified immunity as to Mr.

---

[12]  Although neither party addresses the additional requirements that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Royer*, 103 S.Ct. at 1325-26, consideration of these elements does not change my conclusion.  The Supreme Court has declined to adopt a *per se* rule as to how long an investigative stop may last.  *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1563, 1575, 84 Led.2d 605 (1985).  More importantly, it was Mr. Frasier's actions in continuing to deny what he knew and the officers suspected about the recording which were principally responsible for the length of the detention.  *See id.*, 105 S.Ct. at 1576 (noting "[t]he delay in this case was attributable almost entirely to the evasive actions of [the defendant], who sought to elude the police . . . .  Except for [the defendant's] maneuvers, only a short and certainly permissible pre-arrest detention would likely have taken place."); *id.* at 1582 (Marshall, J., concurring in the judgment) (joining in the judgment based on recognition that defendant's actions prolonged the search).

Frasier's Fourth Amendment seizure claim, and defendants' motion thus should be granted as to that claim.

(2) <strong>Search of tablet</strong>

As noted above, it is conceded that genuine disputes of material fact preclude summary judgment as to Mr. Frasier's claim that Officer Evans's alleged search of the tablet violated the Fourth Amendment.  The other officer defendants, however, seek summary judgment insofar as they are implicated in that claim.

"'Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation.'"  *Schneider v. City of Grand Junction Police Department*, 717 F.3d 760, 768 (10th Cir. 2013) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  The evidence before me is insufficient for a reasonable jury to conclude any of these officers personally participated in the actual search of the tablet.[13]  Although Mr. Frasier asserts Officer Evans, after taking the tablet from him and searching unsuccessfully for the video, "hollered" over his shoulder to another officer, Mr. Frasier could not identify that officer at all.[14]  The only other person who can be seen on the video joining Officer Evans and Mr. Frasier behind the SUV where the alleged search took place is not one of the officer defendants.  That Officer Evans subsequently conferred with one or more of these defendants *after* the alleged search is

---

[13]  What the officers may or may not have said to Mr. Frasier or understood about Officer Evans's intentions to search the tablet, while relevant to Mr. Frasier's claim of civil conspiracy, are not relevant in this context.  Moreover, Mr. Frasier does not allege – and nothing in the evidence before me suggests – that any of the other officer defendants exercised control or direction over Officer Evans or was in a position to supervise him yet failed to do so.  *See Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010), *cert. denied*, 131 S.Ct. 2150 (2011).

[14]  Moreover, Mr. Frasier himself testified that this unidentified officers simply told Officer Evans "as long as there's no video, it's okay."

simply irrelevant.[15]  Accordingly, Sergeant Bothwell, Detective Bauer, and Officers

Jones and Robledo are entitled to summary judgment as to this claim as well.

### c. *Failure to intervene claim*

Mr. Frasier also asserts claims against Sergeant Bothwell, Detective Bauer, and

Officers Jones and Robledo for failure to intervene.

> [L]aw enforcement officials have an affirmative duty to
> intervene to protect the constitutional rights of citizens from
> infringement by other law enforcement officers in their
> presence.  An officer who fails to intercede is liable for the
> preventable harm caused by the actions of the other officers
> where that officer observes or has reason to know. . . that
> any constitutional violation has been committed by a law
> enforcement official.

*Hall v. Burke*, 12 Fed. Appx. 856, 861 (10th Cir. June 12, 2001).  *See also Jones v.*

*Norton*, 809 F.3d 564, 576 (10th Cir. 2015) ("In order to be liable for failure to intervene,

the officers must have observed or had reason to know of a constitutional violation and

have had a realistic opportunity to intervene."), *cert. denied*, 137 S.Ct. 197 (2016).  The

defendant officers point out, correctly, that mere presence at the scene is insufficient to

render an officer liable for failure to intervene.  *See Bark v. Chacon*, 504 Fed. Appx.

741, 745 (10th Cir. Dec. 5, 2012).  Since there is no evidence that any of them witnessed

or was in a position to witness Officer Evans's alleged search of the tablet, they

maintain they are entitled to summary judgment.  *See id.* at 745-46.

Mr. Frasier responds by pointing the court to the moments which preceded the

allegedly illegal search, when all five officer defendants surrounded him and insisted he

---

[15]  The HALO video quite clearly shows Officer Evans emerging from behind the vehicle after conferring with Mr. Frasier with only a piece of paper – presumably Mr. Frasier's witness statement – in his hand.

"needed" to turn over the tablet "because it was in the best interest of the Denver Police Department and everyone involved."  Although Mr. Frasier cannot identify which officer or officers made these statements, he posits that, by their presence at that encounter, they had reason to know of Officer Evans's intention to search the tablet and should have intervened to stop him.

I agree with the defendant officers that they are entitled to qualified immunity as to this claim, but on the ground that the law was not clearly established.  Mr. Frasier has not cited any Tenth Circuit or Supreme Court case, nor the clearly established consensus of other federal courts of appeals – and I have found none – establishing that an officer may be liable for failure to intervene when he does not stop another officer's inchoate plan to commit a constitutional violation.  In fact, another court in this district specifically rejected a similar attempt to establish (at the pleading stage) a failure-to-intervene claim by relying on a defendant's alleged foreknowledge of an allegedly anticipated but as yet unrealized constitutional violation.  *See Estate of Strong v. City of Northglenn, Colorado*, 2018 WL 1640251 at *4 (D. Colo. Apr. 5, 2018).[16]

Accordingly, Sergeant Bothwell, Detective Bauer, and Officers Jones and Robledo are entitled to summary judgment on Mr. Frasier's failure to intervene claim.

    d. *Civil conspiracy claim*

Finally, Mr. Frasier alleges a claim against all the officer defendants for

---

[16]  Although unlike the defendants in *Estate of Strong*, the officer defendants in this case were physically present at the scene, Mr. Frasier has adduced no authority, much less clearly established authority, demonstrating that a failure-to-intervene claim may lie in circumstances such as those presented here.

conspiring to violate his civil rights.  "[A] federal conspiracy action brought under

[section 1983] requires at least a combination of two or more persons acting  in concert

and an allegation of a meeting of the minds, an agreement among the defendants, or a

general conspiratorial objective."  **Brooks v. Gaenzle**, 614 F.3d 1213, 1227-28 (10th Cir.

2010), **cert. denied**, 131 S.Ct. 1045 (2011).  Moreover, as with any section 1983 claim,

Mr. Frasier first must establish the putative denial of a federally protected right.  **See**

**Snell v. Tunnell**, 920 F.2d 673, 701-02 (10th Cir. 1990), **cert. denied**, 111 S.Ct. 1622

(1991).  Because I have found no Fourth Amendment violation with respect to the

putative seizure of Mr. Frasier by Officer Evans, and because he has conceded any

such claims against the other officer defendants, the officer defendants are entitled to

summary judgment on the civil conspiracy claim to the extent it is premised on

allegations of unlawful seizure.

    The same is not true, however, with respect to Mr. Frasier's conspiracy claim as

it relates to the alleged illegal search of his tablet.  While "[c]onclusory allegations of

conspiracy are insufficient to state a valid § 1983 claim," **Tonkovich v. Kansas Board**

**of Regents**, 159 F.3d 504, 533 (10th Cir. 1998) (citation and internal quotation marks

omitted), it is likewise true that Mr. Frasier

> need not prove that each participant in a conspiracy knew
> the "exact limits of the illegal plan or the identity of all the
> participants therein."  An express agreement among all the
> conspirators is not a necessary element of a civil conspiracy.
> The participants in the conspiracy must share the general
> conspiratorial objective, but they need not know all the
> details of the plan designed to achieve the objective or
> possess the same motives for desiring the intended
> conspiratorial result.  To demonstrate the existence of a
> conspiratorial agreement it simply must be shown that there

> was "a single plan, the essential nature and general scope of which [was] know to each person who is to be held responsible for its consequences."

*Snell*, 920 F.2d at 702 (internal citations omitted).  Mr. Frasier has adduced evidence sufficient to create genuine disputes of material fact as to whether the officer defendants came to an agreement which ultimately led to Officer Evans's alleged illegal search of the tablet.  The HALO video shows the officers surrounding Mr. Frasier.  It appears obvious from the video (or at least a reasonable jury could conclude, even without sound) that a heated discussion took place, after which Mr. Frasier conceded to the officers' demands.

It is not fatal to this claim that Mr. Frasier cannot identify which officer said what to him.  All were present for this encounter, and coupled with Mr. Frasier's testimony, the evidence, if credited by the jury, could support a reasonable conclusion that together, the officer defendants agreed, whether expressly or tacitly, to force Mr. Frasier to submit the tablet to a search.  Defendants thus are not entitled to summary judgment on this claim.[17]

### B.  MUNICIPAL LIABILITY CLAIMS

1. <u>Factual background</u>.

Each of the individual defendant officers testified at their respective depositions that they understood as of the date of the events described above that citizens had a

---

[17] Defendants do not argue the law was not clearly established as to this alleged violation of Mr. Frasier's constitutional rights, and I therefore infer they do not intend to argue as much, or have forfeited any such argument.

right to record them in the execution of their official duties in public places.[18]   Indeed,

although the DPD's Operations Manual did not include any statement regarding this

issue until November 2015,[19] the City nevertheless claims such was the policy of the

DPD and that DPD officers were expressly trained regarding these rights well prior to

that date.

The City points first to a February 2007 DPD Training Bulletin entitled "Denver

CopWatch Volunteers."[20]   The Bulletin stated, relevantly:

> Members of the public have the right to observe police
> officers so long as the members of the public do so in a way
> that does not interfere with the officers' ability to do their job.
> The public also has the right to record, videotape,
> photograph, and otherwise document officers and individuals
> contacted or detained by officers in public places.  These
> rights include the right to film, videotape, and photograph
> and otherwise document an officer's contact with juveniles in
> public places.  Officers will respect this right to observe and
> refrain from detaining or arresting individuals who are only
> observing police actions in public areas.

This Bulletin was distributed to every DPD police officer and recruit then on the force

and later incorporated in training for future recruits.  Such Training Bulletins reflect and

---

[18]   To the extent these acknowledgments appear to run counter to the officers' motion for qualified
immunity as to Mr. Frasier's First Amendment retaliation claim – which I previously granted (*see* **Order
Re: Objections to Recommendation of United States Magistrate Judge** at 2-7 [#70], filed September
28, 2017) – they are the subject of **Plaintiff's Motion To Reconsider Order Re: Objections to
Recommendation of United States Magistrate Judge [Dkt. 70]** [#107], filed August 17, 2018, which I
will address by separate order.

[19]   As Captain John Burbach testified at his Rule 30(b)(6) deposition, policy might be
communicated in a Training Bulletin rather than the Operations Manual because it could be "produced
quicker and . . . have more information to help officers understand the context of why this information is
important."  DPD Chief Robert White made the decision to consolidate this and other Bulletins and officer
directives into the Operations Manual.  With respect to this specific policy, it is uncontroverted that it was
included in the Operations Manual to improve and clarify existing policy.

[20]   As described in the Bulletin, "Denver CopWatch is an organization whose members will often
observe and videotape police actions, including involved officers and officers' names and badges."

have the force of DPD policy until superseded by an updated bulletin or the Operations

Manual.  Indeed, this policy ultimately was incorporated into the Operations Manual in

2015.

Second, starting In 2010, the DPD provided a ten-hour, mandatory course for

supervisors (that is, those at the rank of sergeant and above) entitled Perspectives on

Policing ("Perspectives").  According to Tyrone Campbell, who was involved in creating

Perspectives, the course, although focused broadly on issues of racial profiling,

included numerous inflection points which led to discussion of citizens' First Amendment

right to record officers.  As Technician Campbell explained, these discussions were

focused on reminding officers that "citizens are watching; they're always watching us."

The course was replaced in 2012 by Respectives, which was offered to line officers.[21]

The Respectives presentation included a slide directly addressing this issue, noting:

> The Civil Rights Division of the Justice Department took an
> important stand last week, declaring that citizens have a
> First Amendment Right to videotape the actions of police
> officers in public places and that seizure or destruction of
> such recordings violates constitutional rights.

Sergeant Bothwell completed the Perspectives on Policing in October 2012.  Detective

Bauer and Officers Evans, Jones, and Robledo all completed Respectives in 2013.

Lastly, the DPD points to informal training officers receive during field training.

Sergeant Bothwell confirmed he spoke to his trainees about the issue of citizens' right to

record beginning in the late 1990s.  Technician Campbell testified he believed it was

"already indoctrinated into our culture that we understood" such a right existed as early

---

[21]  Respectives is still offered by the DPD under the title "Policing in Modern Times."

as 2009.[22]  Each of the defendant officers also testified they understood citizens had

such a right at the time they encountered Mr. Frasier.[23]

2.  Mr. Frasier's claims.

Mr. Frasier claims the City of Denver is liable for failing to adopt a policy with

respect to the First Amendment rights of citizens to record police officers in the public

exercise of their duties, and for failing to train, supervise, and/or discipline its officers

regarding this issue.  The undisputed facts give lie to these claims.

To prove his claims of municipal liability, Mr. Frasier must show "(1) that a

municipal employee committed a constitutional violation, and (2) that a municipal policy

or custom was the moving force behind the constitutional deprivation." *Estate of Bleck*

*ex rel. Churchill v. City of Alamosa, Colorado*, 540 Fed. Appx. 866, 874 (10th Cir.

Nov. 4, 2013), *cert. denied*, 134 S.Ct. 2845 (2014) (citation and internal quotation

marks omitted).[24]  Here, it is plain the City had in place, at the time of the events giving

rise to this lawsuit, an official policy which clearly affirmed citizens' First Amendment

rights to record the police in the public discharge of their official duties.

---

[22]  Technician Campbell referenced two incidents which he believed occurred between 2009 and 2014 in which DPD officers took actions which ostensibly violated citizens' First Amendment right to record.  Commander Michael Battista averred there had been "less than five" citizen complaints regarding such actions since 2012.  The evidence before me contains few particulars regarding any of these incidents, and Mr. Frasier does not reference or rely on them in support of his claims.

[23]  Although the City argues its officers received relevant information and field training as early as 2011 regarding the constitutional parameters of their ability to seize and search electronic devices, it is clear that Mr. Frasier has not asserted such a claim.

[24]  Mr. Frasier failed to plead a claim against the City premised on the alleged maintenance of an unofficial custom or practice.  (*See* **Order Re: Objections to Recommendation of United States Magistrate Judge** at 7 [#70], filed September 28, 2017.)  I thus consider only whether the City is entitled to summary judgment as to Mr. Frasier's allegations that it maintained an unconstitutional policy, or alternatively, failed to adopt an appropriate policy.

That such policy was not included in the Operations Manual until 2015 is of no

moment; the uncontroverted testimony confirms the Training Bulletin issued in 2007 had

the force and effect of official policy.  Nor am I persuaded by Mr. Frasier's suggestion

that the Bulletin was limited to the rights of CopWatch participants.  The Bulletin refers

generally and globally to the rights of "members of the public."  No competent officer –

and no reasonable juror – could read the document in so limited and myopic a fashion.

Even if they could, the undisputed testimony establishes that DPD officers generally,

and these defendant officers specifically, understood – through both their formal and

informal training – that the policy of the DPD was to allow citizens to record officers in

the public execution of their official duties.  The City therefore is entitled to summary

judgment on this aspect of Mr. Frasier's municipal liability claim.

Nor does the evidence support any intimation that the City failed to adequately

train its officers in this regard.  "[T]he inadequacy of police training may serve as the

basis for § 1983 liability only where the failure to train amounts to deliberate indifference

to the rights of persons with whom the police come into contact."  *City of Canton, Ohio*

*v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).[25]  The City

most assuredly was not deliberately indifferent to the First Amendment rights of citizens

in this regard.  Not only did all the defendant officers in this case receive formal and

informal training on these issues, but again, all testified they understood at the time of

---

[25]  Although Mr. Frasier also alleged that the City failed to adequately supervise and adequately
discipline its officers with respect to their alleged violation of First Amendment rights, he does not even
address, much less substantiate, any such claims.  *See Estate of Reat v. Rodriguez*, 2014 WL 4358333
at *2 n.4 (D. Colo. Sept. 3, 2014) (municipal liability claims for failure to supervise and/or discipline
analyzed under standards applicable to failure to train claims).  The City therefore is entitled to summary
judgment as to these aspects of Mr. Frasier's municipal liability claim as well.

their encounter with Mr. Frasier that citizens had the right to record them.[26]  The City

plainly is entitled to summary judgment on this aspect of Mr. Frasier's municipal liability

claim as well.

## IV.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendants' Motion for Partial Summary Judgment** [#96], filed July

30, 2018, is granted in part and denied in part, as follows:

    a.  That the motion is granted with respect to the following claims:

        (1) For unlawful seizure in violation of the Fourth Amendment

        against defendant Christopher L. Evans;

        (2) For unlawful detention against defendants Charles C. Jones;

        John H. Bauer; Russell Bothwell; and John Robledo;

        (3) For unlawful search in violation of the Fourth Amendment

        against defendants Charles C. Jones; John H. Bauer; Russell

        Bothwell; and John Robledo;

        (4) For failure to intervene against defendants Charles C. Jones;

        John H. Bauer; Russell Bothwell; and John Robledo;

        (5) For civil conspiracy to violate civil rights against defendants

        Christopher L. Evans; Charles C. Jones; John H. Bauer; Russell

        Bothwell; and John Robledo insofar as that claim is premised on

---

[26]  Again, and as noted above, whether these acknowledgments by the individual defendant officers are fundamentally inconsistent with my prior conclusion that these same defendants were entitled to qualified immunity on Mr. Frasier's First Amendment claims against them is an issue I will address in analyzing Mr. Frasier's motion for reconsideration of that determination.

the seizure of Mr. Frasier;

(6) For failure to adopt a policy regarding the First Amendment rights of citizens to film officers in the public exercise of their official duties against defendant the City and County of Denver, Colorado; and

(7) For failure to train, supervise, and discipline officers with respect to the First Amendment rights of citizens to film officers in the public exercise of their official duties against defendant the City and County of Denver, Colorado; and

b.  That the motion is denied with respect to Mr. Frasier's claim for civil conspiracy against defendants Christopher L. Evans; Charles C. Jones; John H. Bauer; Russell Bothwell; and John Robledo insofar as that claim is premised on the allegedly illegal search of Mr. Frasier's tablet;

2.  That at the time judgment enters, judgment with prejudice shall enter as follows:

a.  On behalf of defendant Christopher L. Evans and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for unlawful seizure in violation of the Fourth Amendment;

b.  On behalf of defendants Charles C. Jones; John H. Bauer; Russell Bothwell; and John Robledo, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for unlawful detention in violation of the Fourth Amendment;

27

c.  On behalf of defendants Charles C. Jones; John H. Bauer; Russell Bothwell; and John Robledo, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for unlawful search in violation of the Fourth Amendment;

d.  On behalf of defendants Charles C. Jones; John H. Bauer; Russell Bothwell; and John Robledo, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for failure to intervene;

e.  On behalf of defendants Christopher L. Evans, Charles C. Jones; John H. Bauer; Russell Bothwell; and John Robledo, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for civil conspiracy to violate constitutional rights insofar as that claim in premised on the seizure of Mr. Frasier;

f.  On behalf of defendant the City and County of Denver, Colorado, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for failure to adopt a policy regarding the First Amendment rights of citizens to film officers in the public exercise of their official duties; and

g.  On behalf of defendant the City and County of Denver, Colorado, and against plaintiff, Levi Frasier, as to Mr. Frasier's claim for failure to train, supervise, and discipline officers with respect to the First Amendment rights of citizens to film officers in the public exercise of their official duties; and

3. That the City and County of Denver, Colorado, is dropped as a named party to this action, and the case caption amended accordingly.

Dated November 21, 2018, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge